Kenneth Scott **KING**, Appellant–Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 58A01–0704–CR–159.**

Court of Appeals of Indiana.

Dec. 11, 2007.

Leanna Weissmann, Lawrenceburg, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

### OPINION

BAKER, Chief Judge.

Here, we reach an age old conclusion—a worthy end does not necessarily justify unreasonable means. Ohio County police officers responded to a party in progress at a rural residence. The officers broke up the party and then required partygoers to pass through two checkpoints—a portable breath test administered to all drivers by officers while still on private property, and a checkpoint set up at the base of the driveway through which all vehicles were required to pass, giving the officers a second chance to observe the drivers to ensure that they were not intoxicated. The State has failed to provide evidence from which we can conclude that these checkpoints are reasonable under Article 1, section 11 of the Indiana Constitution.

Appellant-defendant Kenneth Scott King brings this interlocutory appeal of the trial court's denial of his motion to suppress evidence relating to charges brought against King by the State for class A misdemeanor operating a vehicle while intoxicated and class C misdemeanor operating a motor vehicle with a blood alcohol content of .08 or higher. Finding that the checkpoints at issue were unconstitutional, we reverse the judgment of the trial court.

### FACTS

Just after midnight on August 3, 2005, Rising Sun Police Officer Lowell Colen responded to a dispatch[1] about a party in progress in rural Ohio County. When Officer Colen arrived at the residence in question, he observed sixty vehicles parked near the home. Several other police officers also responded to the dispatch. To ensure that none of the partygoers drove away from the party while intoxicated, the officers set up a checkpoint in the road, immediately adjacent to the driveway, in such a way that anyone leaving the house would have to drive through the checkpoint. After breaking up the party, the officers administered portable breath tests (PBTs) to everyone exiting the residence who planned on driving and then required all vehicles to drive through the checkpoint, where the officers observed the drivers to further ensure that no one was intoxicated.

As he monitored the checkpoint, Officer Colen observed King slowly driving his vehicle near other parked vehicles in the residence's yard. The officer "felt like" King was trying to avoid the checkpoint; consequently, Officer Colen stopped King and administered a PBT, which King failed. Tr. p. 8. On August 4, 2005, the State charged King with class A misdemeanor operating a vehicle while intoxicated and class C misdemeanor operating a motor vehicle with a blood alcohol content of .08 or higher. King filed a motion to suppress on November 14, 2006, and following a hearing, the trial court denied the motion on February 15, 2007, finding as follows:

1. On August 3, 2005, an officer was dispatched to a party after midnight;

2. A large crowd was at the party;

3. The officers checked several cars;

4. The party goers were informed about the check;

5. The Defendant went around the check point;

---

1. The record reveals neither the source of the call or the basis of the complaint.

6. The Defendant departed from the lawn or road and drove in the grass to avoid the check point; and

7. The motion should be denied.

CONCLUSIONS OF LAW. In [*State v. Gerschoffer*, 763 N.E.2d 960 (Ind.2002),] the Indiana Supreme Court held that sobriety check points are permitted[, provided] that they meet certain criteria. The roadblock was designed to target a serious danger specific to vehicles [sic] operation. We have to take into consideration that a party was in process at which alcohol was being consumed and that something had to have brought all this to the attention of the police. The purpose was to prevent drunken driving on the highways. The general public was not inconvenienced by the road block. It was designed to target a limited number of persons and to present [sic] intoxicated drivers from driving on the highway. The Defendant obviously intentionally awarded [sic] the roadblock.

Appellant's App. p. 38–39. King now brings this interlocutory appeal.

## DISCUSSION AND DECISION

■ King argues that the dual checkpoints violated the Fourth Amendment to the United States Constitution and Article 1, section 11 of the Indiana Constitution. He also contends that Officer Colen's conclusion that King attempted to avoid the checkpoint was unreasonable and that, in any event, the mere avoidance of a checkpoint does not give a police officer sufficient reasonable suspicion to conduct a traffic stop.

■ In reviewing the denial of a motion to suppress, we do not reweigh the evidence and consider conflicting evidence most favorably to the trial court's ruling. *Taylor v. State*, 689 N.E.2d 699, 702 (Ind. 1997). We must also, however, consider any uncontested evidence that is favorable to the defendant. *Fair v. State*, 627 N.E.2d 427, 434 (Ind.1993). And we review constitutional challenges de novo. *State ex rel. Willard Library v. Evansville–Vanderburgh Pub. Library*, 848 N.E.2d 1162, 1164 (Ind.Ct.App.2006).

■■ We begin our analysis with the Indiana Constitution. Article 1, section 11 must be liberally construed to guarantee the people against unreasonable search and seizure. *Cheatham v. State*, 819 N.E.2d 71, 76 (Ind.Ct.App.2004). The purpose of this provision is to protect against unreasonable police activity in areas of life that Indiana citizens regard as private. *Id.*

■ Our Supreme Court has held that "[a] minimally intrusive roadblock designed and implemented on neutral criteria that safely and effectively targets a serious danger specific to vehicular operation is constitutionally reasonable, unlike the random and purely discretionary stops we have disapproved." *Gerschoffer*, 763 N.E.2d at 966. Among the relevant factors to be considered are: (1) whether the roadblock was staged pursuant to a formal, neutral plan approved by appropriate officials; (2) the objective, location, and timing of the checkpoint, taking these factors into account to determine whether the seizure was well calculated to effectuate its purpose; (3) the amount of discretion exercised by field officers conducting the checkpoint, with a goal of minimal discretion to ensure against arbitrary or inconsistent actions by the screening officers; (4) degree of intrusion and whether the roadblock was avoidable; (5) whether the surrounding conditions of the checkpoint were safe; and (6) whether the checkpoint was effective. *Id.* at 967–70.

*A Formal Plan.* The *Gerschoffer* court favorably described Connecticut guidelines, which

required, among other things, advance approval by ranking officers; a careful choice of location, date and time "after considering many factors, including the safety of the public and those conducting the operation and the potential inconvenience to the public"; advance publicity; and assurance to drivers that the stop was routine.

*Id.* at 967 (quoting *State v. Boisvert,* 40 Conn.App. 420, 671 A.2d 834, 837 (1996)). The *Gerschoffer* court then noted that although a police officer testified that he had followed written federal and state police guidelines in conducting the roadblock, the guidelines were not part of the record; consequently, the court was unable to assess the efficacy of those guidelines.

Here, the State did not present *any* evidence establishing that this checkpoint was staged pursuant to a formal, neutral plan or guidelines. To the contrary, the evidence in the record essentially establishes that the officers in question set up the checkpoint spontaneously in an impromptu response to the party. Officer Colen testified that there was no written policy regarding how to administer PBTs to a large group. Tr. p. 10. In other words, the record does not support a conclusion that the officers were acting pursuant to a formal, neutral plan.

 *Objective, Location, and Timing.* As explained by our Supreme Court, " '[a] seizure is not reasonable unless it is well calculated to effectuate its purpose.' " *Gerschoffer,* 763 N.E.2d at 967 (quoting *State v. Garcia,* 500 N.E.2d 158, 167 (Ind.1986)

(Shepard, J., dissenting)). More specifically,

[t]o be constitutionally reasonable, the location and timing of sobriety checkpoints should take into account police officer safety, public safety, and public convenience. The roadblock should also effectively target the public danger of impaired driving. Here, the State did not offer any evidence of objective considerations such as an unusually high rate of OWI-related accidents or arrests in the chosen area. The State has therefore not shown that this roadblock was sufficiently related to the legitimate law enforcement purpose of combating drunk driving.

*Id.* at 968.

Here, the location—on private property for the PBTs and on a public roadway immediately adjacent to a driveway for the checkpoint—and timing—sometime after midnight—present no substantial problems in relation to police officer safety, public safety, or public convenience. We find it particularly troubling, however, that the seizures took place on private property and immediately adjacent to private property. Even more compelling, the checkpoints were clearly targeted at a specific group of people rather than at the public in general.

 Furthermore, although the State offered their goal of ensuring that none of the partygoers drove away from the party intoxicated as an objective, it has offered *no* evidence aside from King's arrest that any alcohol was consumed at the party. The officer did not testify that he observed anyone consuming alcohol or that anyone attending the party appeared to be intoxicated.[2] Thus, it is not at all clear that

---

2. In its brief, the State attempts to shoehorn in "evidence" that it would offer at trial regarding the surrounding circumstances of the party and the checkpoint if we were to affirm

the denial of the motion to suppress. This tactic could not be more inappropriate. As the State well knows, we may not and should not consider material that is not part of the rec-

these checkpoints effectively targeted the danger of impaired driving. This factor, therefore, does not weigh in favor of the checkpoint's constitutionality.

*Officer Discretion.* Our Supreme Court explained that the State must establish that "it provided sufficiently explicit guidance to ensure against arbitrary or inconsistent actions by the screening officers," emphasizing that this factor is "very important...." *Gerschoffer,* 763 N.E.2d at 969. In *Gerschoffer,* part of the police officers' guidelines satisfied the constitutional standard: "[the officer] flagged in five vehicles at a time, then allowed other traffic to flow through. As soon as all five vehicles were cleared, [the officer] flagged in five more, without regard to vehicle type." *Id.* (emphasis added) The court went on, however, to observe that

> [o]ther procedures, however, were not as carefully controlled. Aside from being told to be "professional and courteous," officers received no specific directive on how to approach and screen motorists. Each individual officer was therefore allowed to decide whether to immediately request license, registration, and/or insurance information from all drivers or only from some of them based on an appearance of impairment or other grounds. No standardized instructions were given to ensure that officers addressed drivers in a consistent manner. Furthermore, each officer had the discretion to decide how many and what type of sobriety tests to perform if he or she detected alcohol.

*Id.* (citations and footnote omitted). Ultimately, the court found that this factor weighed against the reasonableness of the roadblock.

Here, yet again, the State wholly failed to present evidence tending to suggest that the police officers had anything other than unfettered discretion. As the partygoers left the party, the police officers directed anyone driving to complete a PBT; as the vehicles drove away from the residence, the officers conducted a visual check of vehicles to determine whether the drivers were intoxicated. There is no evidence of standardized instructions or a standardized plan and, as in *Gerschoffer,* each individual officer was allowed to decide how to conduct the PBT and visual examination of each partygoer, vehicle, and driver. This "very important factor," therefore, weighs heavily against the checkpoint's reasonableness.

*Degree of Intrusion and Avoidability.* In considering the degree of intrusion, we consider the length of detention and whether the roadblock was avoidable. In *Gerschoffer,* the average length of detention was four minutes, and the court found the reasonableness of that timeframe to be "questionable." *Id.* at 969. Here, yet again, there is no evidence in the record establishing how long it took for officers to administer the PBTs or how long it took for drivers waiting to exit the property to make it through the second checkpoint. The mere fact that partygoers were forced to pass through two checkpoints weighs heavily against the reasonableness of the State's actions.

As for the avoidability of the checkpoint, our Supreme Court commented that "[t]he more avoidable a roadblock is, the less it interferes with the liberty of individual drivers." *Id.* The court cited with approval the Marion County sobriety checkpoint procedures, which provide that

ord. It had a chance to present evidence in support of the checkpoint at the hearing on King's motion to suppress and it failed to do so. It is improper to attempt to take a second

bite of the apple at this stage of the litigation, and we caution the State against making such attempts in future appeals.

"[a] motorist who wishes to avoid the sobriety checkpoint site by legally turning before entering the checkpoint area shall be allowed to do so unless the driver engages in any unlawful, unusual or dangerous behavior. The act of avoiding a sobriety checkpoint does not constitute the grounds for a stop."

*Id.* at 970 n. 11. In *Gerschoffer,* the sign announcing the sobriety checkpoint was noticeable only after the driver was past the roadblock's entry point. Thus, although approaching drivers could have theoretically turned and avoided the checkpoint, they may not have realized that the activity ahead was a checkpoint until the point of no return. The court found that "[t]he lack of demonstrated avoidability therefore weighs slightly against the State." *Id.* at 970.

Here, both checkpoints were completely unavoidable. If partygoers wished to exit the property, then the drivers had to pass a PBT and also pass through the visual inspection checkpoint. The driver of the one vehicle that allegedly attempted to avoid the checkpoint—King—ended up being stopped, arrested, and charged with operating while intoxicated. This complete lack of avoidability weighs heavily against the State.

*Safety.* The safety of the checkpoints is not at issue, inasmuch as they occurred on or immediately adjacent to private property. Neither officers nor the public were put at risk by the checkpoints.

*Effectiveness.* The *Gerschoffer* court first examined the apprehension rate of the roadblock at issue, noting that officers arrested fourteen of 198 vehicles funneled through the checkpoint, only two of which were for operating while intoxicated. Acknowledging that apprehension rates are not the end of the question, the court explained that "a modest arrest rate may simply reflect the fact that advance public-

ity scared those who would drink and drive off the roads." *Id.* at 970. Finding no evidence from which it could infer that the low apprehension rate was the effect of a successful media blitz, the court did not conclude that the checkpoint effectively deterred potential offenders.

Here, out of approximately sixty partygoers, King was the only person who was arrested for operating while intoxicated. That is an inarguably low apprehension rate. The State contends, however, that the dual checkpoints may have deterred intoxicated partygoers from getting behind the wheel and driving away from the party. As noted above, however, there is no evidence that the partygoers had been consuming alcohol at the party. Moreover, King aptly points out that the mere presence of the officers likely acted as a deterrent to any partygoers who may have been intoxicated. We simply cannot infer, based on this record, that the two checkpoints were effective in deterring potential offenders.

Given that five out of the six factors weigh slightly or heavily against the reasonableness of the dual checkpoints, we are compelled by *Gerschoffer* to conclude that the State did not meet its burden to show that these checkpoints were constitutionally reasonable under the Indiana Constitution.

■ The State argues that rather than applying the *Gerschoffer* factors, we should adopt the federal approach to situations involving the special needs of law enforcement. If we apply that test, the State must establish that the balance of the following factors weighs in favor of the checkpoints' reasonableness: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method imposes on ordinary citizens; and (3) the extent of law

enforcement needs. *Litchfield v. State,* 824 N.E.2d 356, 361 (Ind.2005) (analyzing the constitutionality of a police officer's warrantless search of a citizen's trash under Article 1, section 11 of the Indiana Constitution).

As for the degree of concern, suspicion, or knowledge that a violation has occurred, as stated above, the State failed to present evidence establishing the basis for the officers' apparent concern that the partygoers had been consuming alcohol. We also cannot tell from the record the degree to which the officers were concerned and/or suspicious.

As for the degree of intrusion, we have already concluded herein that the intrusion was substantial. The partygoers were stopped twice. We do not know how long each stop lasted, nor do we know how long partygoers waited in their vehicles as they attempted to exit through the checkpoint at the driveway's end. There was no way in which partygoers could have avoided the checkpoints if they wanted to leave the residence.

Finally, as to the extent of law enforcement needs, Officer Colen testified that the officers "tried to maintain order and keep things settled down." Tr. p. 4. That is the entirety of the evidence in the record establishing the extent of law enforcement needs. There is no evidence establishing that the situation was out of control or that, even if it was, the dual checkpoint system was designed to maintain control. Moreover, there is no evidence establishing that alcohol had been consumed at the party or that many of the partygoers were intoxicated. Thus, even if we were to apply the three-part test suggested by the State, we would find that the State has not met its burden of establishing that the totality of circumstances supports a conclusion that the checkpoints were reasonable.

We are compelled by *Gerschoffer*—or, if the State prefers, by *Litchfield*—to conclude that the State's actions herein violated Article 1, section 11 of the Indiana Constitution. We need go no further and decline to address the parties' arguments under the Fourth Amendment. We also need not address King's arguments that he was not attempting to evade the checkpoint and that, even if he was, the officers were not entitled to arrest him for the evasion.

The judgment of the trial court is reversed.

BAILEY, J., and VAIDIK, J., concur.