**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**TODD L. SALLEE**
Ladd, Thomas, Sallee & Associates
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MARJORIE LAWYER-SMITH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

VAUGHN BLACKBURN,               )
                                )
    Appellant-Defendant,      )
                                )
        vs.               )    No. 32A04-1112-CR-659
                                )
STATE OF INDIANA,               )
                                )
    Appellee-Plaintiff.       )

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Mark A. Smith, Judge
Cause No. 32D04-1003-CM-80

**July 25, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

Vaughn Blackburn appeals his conviction for operating a vehicle while intoxicated, as a Class A misdemeanor, following a bench trial. Blackburn presents a single issue for our review, namely, whether the trial court abused its discretion when it admitted evidence police obtained after stopping Blackburn at a sobriety checkpoint.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

On Sunday, March 21, 2010, at approximately 1:20 a.m., Blackburn was driving his pickup truck in Hendricks County when he was stopped at a sobriety checkpoint being conducted by the Indiana State Police on State Road 67. After Indiana State Trooper Scott Probasco approached Blackburn in his truck, Trooper Probasco noticed an odor of alcohol and observed that Blackburn's eyes were red and glassy, his speech was slurred, his manual dexterity was poor, and his balance was unstable. Blackburn failed three field sobriety tests, and a blood draw subsequently showed that his blood alcohol concentration was .15.

The State charged Blackburn with operating a vehicle while intoxicated, as a Class A misdemeanor, and operating a vehicle with an ACE of .15 or more, as a Class A misdemeanor. Blackburn moved to suppress the evidence of his intoxication alleging that the sobriety checkpoint violated the state and federal constitutions. The trial court denied that motion following a hearing. After a bench trial, the trial court found Blackburn guilty as charged, but entered judgment of conviction only on the first count of operating a vehicle while intoxicated. This appeal ensued.

## DISCUSSION AND DECISION

Blackburn contends that the trial court abused its discretion when it admitted the evidence of his intoxication because, he maintains, the sobriety checkpoint violated the state and federal constitutions. In support of his argument based on the Indiana constitution, Blackburn relies on our supreme court's opinion in State v. Gerschoffer, 763 N.E.2d 960 (Ind. 2002), which sets out the criteria Indiana courts should use to determine the constitutionality of sobriety checkpoints under Article I, Section 11 of the state constitution. We address his contentions under the federal and state constitutions in turn.

### Article I, Section 11

Article I, Section 11 must be liberally construed to guarantee the people against unreasonable search and seizure. King v. State, 877 N.E.2d 518, 521 (Ind. Ct. App. 2007). The purpose of this provision is to protect against unreasonable police activity in areas of life that Indiana citizens regard as private. Id.

In Gerschoffer, our supreme court "join[ed] those jurisdictions rejecting the contention that all roadblocks are per se violations of state constitutional requirements" and set out criteria to determine whether a particular sobriety checkpoint "was conducted in a constitutionally reasonable manner." 763 N.E.2d at 966. The court held that "[a] minimally intrusive roadblock designed and implemented on neutral criteria that safely and effectively targets a serious danger specific to vehicular operation is constitutionally reasonable, unlike the random and purely discretionary stops we have disapproved." Id. Among the relevant factors to be considered are: (1) whether the roadblock was staged pursuant to a formal, neutral plan approved by appropriate officials; (2) the objective, location, and timing of the checkpoint, taking these factors into account to determine

whether the seizure was well calculated to effectuate its purpose; (3) the amount of discretion exercised by field officers conducting the checkpoint, with a goal of minimal discretion to ensure against arbitrary or inconsistent actions by the screening officers; (4) the degree of intrusion and whether the roadblock was avoidable; (5) whether the surrounding conditions of the checkpoint were safe; and (6) whether the checkpoint was effective. Id. at 967-70.

Here, Blackburn contends that the state police did not adequately advertise the checkpoint ahead of time and that the lack of publicity rendered it unconstitutional under some of the criteria set out in Gerschoffer. While publicity is not one of the six criteria enumerated in Gerschoffer, publicity surrounding a sobriety checkpoint is a factor to be considered in determining whether a sobriety checkpoint satisfies those criteria. In particular, Blackburn maintains that an analysis of four of the criteria set out by the supreme court supports a determination that the sobriety checkpoint here was unconstitutional. We address each of the challenged criteria in turn.

Effectiveness

Blackburn first contends that there was a "complete lack of publicity" regarding the checkpoint and that "[t]he lack of publicity weighs heavily against the effectiveness of the checkpoint." Brief of Appellant at 10. In support of that contention, Blackburn cites to Gerschoffer, where, in analyzing the effectiveness of the checkpoint in that case, our supreme court observed that "advance publicity" of a sobriety checkpoint can "scare[] those who would drink and drive off the roads." 763 N.E.2d at 970. And in

4

Gerschoffer, the court held that, given the "fairly low percentage" of OWI arrests[1] obtained in that roadblock and the lack of evidence of advance publicity of the roadblock, it could not infer that the checkpoint had "effectively deterred potential offenders." Id. at 971.

Here, out of twenty-seven vehicles that were stopped at the checkpoint, police made four arrests for driving while intoxicated. Compared to the two OWI arrests out of seventy stops in Gerschoffer, the arrest rate here, while not a high percentage, was significantly higher. Regarding publicity for the checkpoint in this case, Indiana State Police Sergeant Egan Sunier testified that he had contacted the public information officer ("PIO") for the Indiana State Police, Sergeant Rich Myers, and had provided the date and time of the scheduled checkpoint. Sergeant Myers had then prepared a press release dated March 15, 2010. The press release states in relevant part as follows:

> Indiana State Police will be conducting a DUI checkpoint in Morgan and Hendricks Counties on Saturday, March 20th. Officers will be observing for intoxicated, impaired and underage drinking drivers. The checkpoint will be operating late Saturday evening and early Sunday morning.
>
> To expedite the time involved if you are stopped at the checkpoint drivers are asked to have their driver's license and registration ready to present to the officer. If no violations or impairment is detected by the officer, motorists should only be delayed a few minutes. Additionally, officers will be conducting saturation patrols in the area to observe for impaired motorists attempting to avoid the checkpoint.

Defendant's Exhibit C.

Blackburn first points out that, while the press release states that the checkpoint would occur on March 20, it actually occurred on March 21 from 12:45 a.m. until 2:00

---

[1] In that case, police stopped seventy out of 198 cars "funneled through the checkpoint" and made only two arrests for OWI. Gerschoffer, 763 N.E.2d at 970.

5

a.m. The press release also states, however, that the checkpoint would operate "late Saturday evening and early Sunday morning." Id. While the press release could have been more specific and stated that the date would be March 21, the fact that the release clearly states that the checkpoint would run into early Sunday morning gave adequate notice to drivers of the date and time of the checkpoint.

Next, Sergeant Sunier testified that he did not know whether "any media outlets" had received the press release. Transcript at 15. However, Sergeant Sunier testified that, in his experience, Sergeant Myers sends Sergeant Sunier a copy of a news release regarding a sobriety checkpoint "[w]hen [Sergeant Myers] sends them out[.]" Id. at 26. And Sergeant Sunier testified that Sergeant Myers had sent him a copy of the press release for this particular checkpoint, which supports a reasonable inference that Sergeant Myers had submitted the press release to a media outlet.

In Gerschoffer, our supreme court noted that "[l]aw enforcement agencies cannot control what the media chooses to report, of course, and may not have funds to pay for publicity." 763 N.E.2d at 970-71. The evidence in that case showed that "some major news sources received no notification at all, and we do not know if television stations carried stories on the planned roadblocks." Id. at 971. Accordingly, the court held that it could not infer, "absent any proven publicity," that the checkpoint effectively deterred potential offenders. Id.

Here, again, the only evidence that the sobriety checkpoint was publicized was Sergeant Sunier's testimony that "[w]hen [Sergeant Myers] sends [press releases] out he sends me a copy" and that Sergeant Sunier had received a copy of the press release in this case. Transcript at 26. Without direct evidence showing that the checkpoint was

6

publicized, it is more doubtful that the checkpoint had a deterrent effect. But while the arrest rate for operating while intoxicated was greater than that obtained in Gerschoffer, we cannot say that the effectiveness factor weighs significantly in favor of the State. We hold that, if anything, the lack of demonstrated effectiveness of this checkpoint weighs against the State. But that, of course, is not the end of our inquiry.

## Degree of Intrusion

Blackburn also contends that the lack of publicity meant an "increased degree of intrusion into the liberty of drivers." Brief of Appellant at 12. In particular, Blackburn maintains that signage put in place to warn drivers that the checkpoint was ahead was inadequate in that "there was no way to determine whether or how the roadblock was avoidable." Id. at 13. We cannot agree.

In Gerschoffer, our supreme court first considered the length of the stop at a sobriety checkpoint and observed that stops lasting from twenty-five seconds to three minutes have been held to satisfy the Fourth Amendment. 763 N.E.2d at 969. But the stops at the checkpoint in Gerschoffer "averaged four minutes," and the court questioned the reasonableness of that detention period. Id. Here, neither party directs us to any evidence regarding the average length of the stops conducted at the checkpoint, so this factor does not bear on our decision. The Sobriety Checkpoint Procedures Manual admitted into evidence, however, states that "[n]o vehicles will be detained for more than a minimal amount of time unless there is reasonable suspicion or probable cause to believe that a felony, misdemeanor, or infraction has occurred or is occurring." Defendant's Exhibit F.

7

Next, in evaluating the degree of intrusion, we also consider whether the roadblock was avoidable. Id. In particular, "[t]he more avoidable a roadblock is, the less it interferes with the liberty of individual drivers. A roadblock need hardly be altogether voluntary, however, or it would have little enforcement or deterrent value." Id.

Here, the sobriety checkpoint was set up on northbound State Road 67 just north of the intersection with County Road 800 South. The State presented evidence that police placed two large, triangular signs warning approaching traffic that a sobriety checkpoint was ahead. Those signs were illuminated by "fuzees" and were placed such that drivers could avoid the checkpoint. Transcript at 24. One sign was placed on the shoulder of northbound State Road 67, just south of the intersection with County Road 800 South, such that drivers could have avoided the roadblock by turning onto County Road 800 South. The second sign was placed on County Road 800 South warning drivers approaching State Road 67 from the east that the roadblock was ahead. While the signage could have been more specific in alerting drivers to the exact location of the checkpoint, we conclude that the checkpoint was generally avoidable.

Still, Blackburn points out that the press release indicates that police officers would be "conducting saturation patrols in the area to observe for impaired motorists attempting to avoid the checkpoint." Defendant's Exhibit C. Thus, Blackburn maintains, the checkpoint was not avoidable as required under the Gerschoffer test. But, again, the evidence shows that the signs were placed in locations that gave drivers enough warning to avoid the checkpoint, and the press release states that officers would be looking for "impaired motorists" attempting to avoid the checkpoint, not all drivers attempting to

8

avoid the checkpoint.  Id.  We hold that the degree of intrusion here was slight and weighs in favor of the checkpoint's constitutionality.

Neutral Plan

Next, Blackburn contends that "[a]lthough there was a neutral plan, the lack of publicity and implication that the roadblock was unavoidable detered [sic] from the neutral plan approved by the appropriate officials."  Brief of Appellant at 13.  In particular, Blackburn maintains that the police were not following the neutral plan, which called for publicity of the checkpoint, when they failed to publicize the checkpoint in advance.  Also, Blackburn asserts that, despite the directive in the Indiana State Police manual that "[t]he act of avoiding a sobriety checkpoint, by itself, does not constitute the grounds for a stop," Defendant's Exhibit F, the press release indicates that officers would be looking for drivers attempting to avoid the roadblock.

In Gerschoffer, the guidelines police followed in conducting the roadblock were not made a part of the record on appeal, so our supreme court was unable to "assess their efficacy."  763 N.E.2d at 967.  Instead, the court cited with approval guidelines set out in a Connecticut case, State v. Boisvert, 671 A.2d 834 (Conn. App. 1996).  In Boisvert, the guidelines promulgated by the public safety commissioner required, "among other things, advance approval by ranking officers; a careful choice of location, date and time 'after considering many factors, including the safety of the public and those conducting the operation and the potential inconvenience to the public'; advance publicity; and assurance to drivers that the stop was routine."  Gerschoffer, 763 N.E.2d at 967 (quoting Boisvert, 671 A.2d at 837).

9

Here, Sergeant Sunier testified that the checkpoint was conducted according to the Indiana State Police Sobriety Checkpoint Procedures Manual, which was admitted into evidence. Indeed, Blackburn's sole argument on this issue is that officers deviated from the neutral plan in only two minor respects—the lack of publicity, which is called for in the Manual; and the statement in the press release that officers would be looking for drivers attempting to evade the checkpoint. But, again, there was at least some evidence supporting a reasonable inference that the press release was distributed to media outlets, and the press release states that officers would be looking only for impaired drivers trying to evade the roadblock. Overall, the evidence shows that the State Police implemented a neutral plan for the checkpoint, which weighs in favor of its constitutionality.

Objective, Location, and Timing

Finally, Blackburn contends that "the lack of publicity previously mentioned went against a stated objective, which was to deter impaired driving." Brief of Appellant at 14. In Gerschoffer, our supreme court stated, that

> [t]o be constitutionally reasonable, the location and timing of sobriety checkpoints should take into account police officer safety, public safety, and public convenience. The roadblock should also effectively target the public danger of impaired driving. Here, the State did not offer any evidence of objective considerations such as an unusually high rate of OWI-related accidents or arrests in the chosen area. The State has therefore not shown that this roadblock was sufficiently related to the legitimate law enforcement purpose of combating drunk driving.

763 N.E.2d at 968.

In Gerschoffer, the stated objective for the checkpoint was a "montage of objectives, including the generic law enforcement goal of 'mak[ing] sure everybody is doing what they're supposed to [do].'" Id. In contrast, here, the objective was to

10

"observ[e] for intoxicated, impaired and underage drinking drivers." Defendant's Exhibit C. Sergeant Sunier testified that the time and location of the checkpoint was chosen because statistics showed that there had been a number of arrests for OWI at those times and at that location. Other than the apparent lack of publicity, Blackburn does not question the evidence supporting the objective, location, and timing of the checkpoint in this case. We cannot say that this element weighs against the constitutionality of the checkpoint.

### Police Discretion and Safe Conditions

Blackburn does not make any argument regarding the final two elements set out in Gerschoffer. Indeed, the evidence supports a determination that the "critical factor" of the degree of discretion exercised by officers conducting the checkpoint weighs in favor of constitutionality here. See Gerschoffer, 763 N.E.2d at 968. The State presented undisputed evidence that the officers in this case had no discretion in determining which cars would be stopped at the checkpoint. A "systematic approach" was implemented whereby a "designated number of vehicles" would be stopped at a time as they entered the checkpoint. Defendant's Exhibit F. And the officers were instructed to make a "uniform statement and question" to each driver stopped at the checkpoint. Id. As for safe conditions, Sergeant Sunier testified that the church parking lot was chosen because drivers could be safely and readily funneled into the well-lighted parking lot, off of State Road 67. Thus, the discretion and safety factors set out in Gerschoffer weigh heavily in favor of constitutionality in this case.

11

Article I, Section 11 Summary

Blackburn's sole contention on the state constitutional issue is that the lack of publicity leading up to the checkpoint meant that four of the Gerschoffer factors were not satisfied, namely: effectiveness, degree of intrusion, neutral plan, and objective. While circumstantial evidence shows that the press release was distributed to the media, overall, the publicity factor does, indeed, weigh against constitutionality in this case. But there is substantial evidence that the officers: implemented a neutral plan in conducting the checkpoint; had a narrow objective for the checkpoint, and chose the timing and location based upon OWI arrest statistics; and did not exercise discretion in conducting the stops. Additionally, the degree of intrusion on drivers was minimal; the checkpoint was operated under safe conditions; and the checkpoint was somewhat effective in deterring drunk driving. We hold that the sobriety checkpoint in this case, all things considered, was constitutional under Article I, Section 11 of the Indiana Constitution. The trial court did not abuse its discretion when it admitted evidence of Blackburn's intoxication at trial.

**Fourth Amendment**

In essence, Blackburn contends that, for the same reasons the checkpoint violated Article I, Section 11, it was unconstitutional under the Fourth Amendment to the United States Constitution. This court has held that traffic checkpoints have been held constitutional under the Fourth Amendment under certain circumstances. See Sublett v. State, 815 N.E.2d 1031, 1034 (Ind. Ct. App. 2004). In particular, we observed that

> In [Michigan Department of State Police v.] Sitz,[ 496 U.S. 444 (1990)], the [United States Supreme] Court applied a three-part test derived from Brown v. Texas, 443 U.S. 47, 50-51 (1979), balancing the state's interest in preventing accidents caused by drunk drivers, the degree to which the checkpoint advances the public interest, and the level of intrusion upon an

12

individual's privacy caused by the checkpoints. The Sitz Court concluded that "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." 496 U.S. at 451. The Court further held that the measure of the intrusion upon motorists stopped briefly at a sobriety checkpoint was slight. Id.

Here, Blackburn does not dispute the State's clear public interest in combating drunk driving. But he maintains that "the degree to which the seizure advanced the public interest is low." Brief of Appellant at 16. And he alleges that "the severity of the interference with liberty was higher due to the lack of publicity and inability or perceived inability to avoid the checkpoint." Id. Thus, Blackburn argues that balancing the three factors set out in Brown shows that the checkpoint here violated the Fourth Amendment. We cannot agree.

Again, there is no dispute that the checkpoint was created in response to a clear state interest in combating drunk driving. And with regard to advancing the public interest, in Sitz police made two arrests for OWI out of 126 stopped vehicles at a checkpoint, and the Court held that the checkpoint was constitutional. 496 U.S. at 454-55. Here, again, police made four arrests for OWI out of twenty-seven vehicles. Finally, the checkpoint in this case provided opportunity for drivers to avoid it, and the Manual directed officers to detain drivers not longer than a "minimal amount of time[.]" Defendant's Exhibit F. We hold that the checkpoint in this case was constitutional under the Fourth Amendment to the United States Constitution. Again, the trial court did not abuse its discretion when it admitted evidence of Blackburn's intoxication at trial.

Affirmed.

RILEY, J., and DARDEN, Sr.J., concur.